NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE REMERON DIRECT PURCHASER ANTITRUST LITIGATION** | : Hon. Faith S. Hochberg<br>:<br>: Civil No. 03-0085 (FSH)<br>: |
| **THIS DOCUMENT RELATES TO:**<br>**ALL ACTIONS** | : **OPINION**<br>:<br>: Date: November 9, 2005<br>:<br>:<br>: |

**HOCHBERG, District Judge:**

   This matter is before the Court upon a settlement agreement between the manufacturers of the anti-depressant drug Remeron, Organon U.S.A. and Akzo Nobel N.V. (collectively "Defendants" or "Organon"), and the direct purchasers of Remeron ("Plaintiffs").  The settling parties seek (1) final approval of their class action settlement agreement and plan of allocation and (2) award of attorneys' fees to Plaintiffs' Counsel, reimbursement of litigation expenses, and incentive awards to named Plaintiffs.   The Court preliminarily approved the settlement at a hearing on August 30, 2005.  The final Fairness Hearing was conducted on November 2, 2005.

# I.   BACKGROUND

## A.   The Litigation

### 1.  The Complaint

In 2003, direct purchasers of Remeron ("Direct Purchasers") filed class action complaints against Defendants.  The complaint alleges that Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by: (a) using various illegal and deceptive means as part of an overall scheme to improperly create and extend patent protection for the drug mirtazapine, which Defendants sold under the brand-name Remeron, by manipulating the Hatch-Waxman statutory scheme; (b) committing affirmative misrepresentations and failing to disclose material prior art in the prosecution of U.S. Patent No. 5,977,099 (the "'099 patent") before the United States Patent and Trademark Office ("PTO"); (c) making false and misleading representations to the Food and Drug Administration ("FDA")  to obtain the listing of the '099 patent in the FDA's Orange Book in a wrongful manner; (d) submitting the '099 patent for listing in the Orange Book approximately 14 months beyond the FDA-mandated deadline for patent listing; and (e) filing and prosecuting sham patent litigation against potential generic competitors.

The complaint alleges that Defendants' conduct delayed the market entry of less expensive generic versions of Remeron, thereby forcing Direct Purchasers to pay artificially inflated prices for both Remeron and its AB-rated generic equivalents (i.e. generic mirtazapine).

### 2. Extensive Discovery and Litigation Prior to Settlement

Plaintiffs' claims were the subject of extensive and contentious discovery.  During three years of hotly contested litigation, Plaintiffs' Counsel composed and propounded  four sets of document requests which, as ordered by the Court, were served on behalf of various coordinated direct and indirect purchaser plaintiffs, as well as subpoenas duces tecum directed to multiple

third parties.  Overall, more than 1 million pages of documents and data were produced by Defendants and third parties.  Plaintiffs' Counsel conducted over 45 depositions of witnesses with knowledge of facts relevant to Plaintiffs' allegations.  Subsequently, Plaintiffs' Counsel retained and worked closely with nearly a dozen experts in the areas of (i) patent prosecution process before the PTO and patent interpretation, (ii) the FDA regulatory regime regarding prescription drugs, (iii) the pharmaceutical industry, and (iv) antitrust economics and the calculation of damages.  The opinion of these experts were necessary both to support the complex theories of liability and damages advanced by Plaintiffs, and to rebut the numerous defenses raised by Defendants.

On September 8, 2004, the Court ruled on Defendants' motion to dismiss the complaints filed by Plaintiffs.  Based on a prior opinion issued in the separate antitrust litigation between Defendants and generic drug manufacturers Mylan, Teva and Alphapharm (the "Generics"), the Court held that Plaintiffs were collaterally estopped from asserting claims arising from the alleged wrongful Orange Book listing and sham litigation.  The Court also dismissed Plaintiffs' Walker Process claim for lack of standing.  Following this opinion, every plaintiff group other than the Direct Purchasers, including the Generics and all other direct and indirect purchasers, chose to settle their claims.

This litigation further engendered significant dispositive motion practice in the form of motions for summary judgment filed by both sides.  Plaintiffs filed three separate motions for partial summary judgment, including motions seeking findings that: (a) Defendants were estopped from relitigating certain findings from the prior patent litigation and, therefore, that the patent litigation was objectively baseless; (b) that the '099 patent was not eligible for listing in the Orange Book; and (c) that Defendants possessed monopoly power over mirtazapine.

In opinions dated September 7, 2004 and February 18, 2005, the Court denied the first and third of these motions, determining, respectively, that (i) Defendants would not be estopped from litigating the objective bases for the prior patent litigation, and (ii) that Plaintiffs could not prove Defendants' monopoly power based solely on "direct" evidence of Defendants' control over the price of mirtazapine.

On October 1, 2004, Defendants filed a single, omnibus motion for summary judgement, which attacked both the legal and factual bases for the "overarching scheme" and "late listing" claims. Defendants' motion also questioned Plaintiffs' ability to demonstrate the existence of monopoly power in a properly defined relevant market. Defendants' motion was pending at the time the Settlement was preliminarily approved, and even a partial finding in Defendants' favor could have severely limited, or barred entirely, the ability of the Direct Purchasers to recover.

On October 27, 2003, Plaintiffs filed their motion for class certification, together with a memorandum of law explaining, *inter alia*, Plaintiffs' theory of class-wide antitrust injury and proposed method of calculating Class damages, supported by the testimony of an expert economist. In preparation for and in furtherance of the class certification motion, Plaintiffs' Counsel engaged in a comprehensive review of numerous issues specific to the pharmaceutical industry, including the economic structure, pricing, and distribution practices of branded and generic manufacturers. Such preparations were necessary in order to support Plaintiffs' motion and rebut numerous defenses to class certification raised by Defendants, including their reliance on the Eleventh Circuit's decision in <u>Valley Drug Co. v. Geneva Pharmaceuticals, Inc.</u>, 350 F.3d 1181 (11th Cir. 2003), which came down during the pendency of this case, and engendered significant supplemental briefing and arguments on the issue of class certification. <u>See</u>  <u>id</u>. Class

4

certification was granted here only after the Settlement had been proposed, and the Defendants stipulated not to oppose Plaintiffs' certification request.

### B.    Mediation and Settlement

In March 2003, the parties began to explore the possibility of settlement.  This process eventually resulted in the Settlement now before the Court, but progress toward this agreement was slow, as each party had strong conviction in their respective claims or defenses. Additionally, throughout the course of this case, the parties participated in a lengthy and complex mediation procedure utilizing both skilled mediators and the good offices of the Court.  This process encompassed multiple hearings and mediation sessions, the first of which was held in January 2004 before Judge Politan.

On August 24, 2005, after full discovery, significant motion practice and a lengthy negotiation process, Plaintiffs' Counsel entered into the Settlement with Defendants.  The Settlement will settle all claims arising out of or relating in any way to any conduct alleged or which could have been alleged in the Class Action relating to any alleged delay in the marketing or selling of Remeron or its generic equivalents, in exchange for payment of $75 million in cash.

The Court preliminarily approved the Settlement and certified the class at a hearing on August 30, 2005.  On September 19, 2005, copies of the Notice Of Proposed Class Action Settlement and Hearing Regarding Settlement (the "Notice") were timely disseminated by first-class mail to all Class members.  The Notice informed Class members, among other things, that they could object to any or all terms of the Settlement, or opt-out of the Class entirely.  The deadline for opting out was October 19, 2005.  No Class member has objected to, or opted-out of the Settlement.

## II.    ANALYSIS

### A.    Final Approval of Class Action Settlement

1. Settlements That Meet Certain Conditions Are Presumed Fair

The Third Circuit affords an initial presumption of fairness for a settlement "if the courts finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Remeron End-Payor Antitrust Litigation, 2005 WL 2230314, *15 (D. N.J. Sep 13, 2005) (hereinafter "End-Payor Opinion"), quoting In re Cendant Corp. Litig., 264 F.3d 201, 233 n. 18 (3d Cir. 2001).

Each of these factors weighs in favor of this presumption in the instant case.  First, settlement negotiations were lengthy and formal, and included both formal presentations to the Court and to skilled mediators, as well as private mediation sessions attended by members of the Class.  Second, as discussed in Part I above, both fact and expert discovery in this case was completed before the Settlement was reached, and included over one million pages of document discovery, and numerous expert reports.  Third, both Plaintiffs' Counsel and Defendants' Counsel are skilled and experienced litigators.  Fourth, not a single member of the Class has objected to, or opted-out of, the proposed Settlement.  Thus, this Court determines that an initial presumption of fairness attaches, although such finding is not dispositive.

2. Standard for Court Approval of Settlement

A class action may be settled under Rule 23(e) upon a judicial finding that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1)(C).  Under Rule 23(e), this Court must determine whether the settlement is within a range that responsible and experienced attorneys could accept considering all relevant risks and factors of litigation.  See Walsh v. Great

6

Atlantic and Pacific Tea Co., 96 F.R.D. 632, 642 (D.N.J. 1983).  The range "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972).

Because a settlement represents an exercise of judgment by the negotiating parties, cases have consistently held that the function of a court reviewing a settlement is neither to rewrite the settlement agreement reached by the parties nor to try the case by resolving issues left unresolved by the settlement.  Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir. 1974); Bullock v. Administrator of Kircher's Estate, 84 F.R.D. 1, 4 (D.N.J. 1979).  "The temptation to convert a settlement hearing into a full trial on the merits must be resisted."  Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1315 (3d Cir. 1993).

To determine whether the settlement is fair, reasonable and adequate under Rule 23(e), courts in the Third Circuit apply the nine-factor test enunciated in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), and recently reaffirmed in Warfarin Sodium, 391 F.3d at 534-35.  These factors are:

> (a)  The complexity, expense, and likely duration of the litigation;
> (b)  the reaction of the class to the settlement;
> (c)  the stage of the proceedings and the amount of discovery completed;
> (d)  the risks of establishing liability;
> (e)  the risks of establishing damages;
> (f)  the risks of maintaining the class action through the trial;
> (g)  the ability of the defendants to withstand a greater judgment;
> (h)  the range of reasonableness of the settlement fund in light of the best possible recovery; and
> (i)  the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Id. (quoting Girsh, 521 F.2d at 156-57).

       3.  <u>Evaluation of the Settlement Under Applicable Standards</u>

       a.  The Complexity, Expense and Likely Duration of the Litigation

This factor requires examination of the additional cost, in time, money and judicial resources, of continued litigation. Courts must balance a proposed settlement against the enormous time and expense of achieving a potentially more favorable result through further litigation. <u>See</u>, <u>e.g.</u>, <u>In re Sunbeam Securities Litigation</u>, 176 F. Supp. 2d 1323, 1332 (S.D. Fla. 2001) (more than three years of complex litigation before settlement reached).

The settlement of this complex antitrust action is clearly favored in view of the long litigation road yet to be traveled. <u>See</u>, <u>e.g.</u>, <u>Behrens v. Wometco Enters., Inc.</u>, 118 F.R.D. 534, 543 (S.D. Fla. 1988), <u>aff'd</u> 899 F.2d 21 (11th Cir. 1990) ("The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex and expensive litigations.").

This case has already been long and hard-fought. Prior to the Settlement, the parties completed significant and voluminous fact and expert discovery, and fully litigated Defendants' motion to dismiss. Still pending are Plaintiffs' motion for class certification, and multiple motions for summary judgment. As this Court observed with respect to the end-payor settlement, "thousands of pages of materials were filed with this Court on summary judgment issues such as market definition, market power, and improper / late listing in the FDA Orange Book." End-Payor Opinion at *17. Absent the Settlement, these motion would have required considerable additional work on the part of the parties and the Court to fully litigate.

Further, if the case were not concluded on summary judgment, a lengthy and expensive trial on liability and damages allegedly caused by Defendants' alleged violations of Sherman Act §2 would likely have followed. Trial preparation on both sides would be necessary. Given

Defendants' vigorous advocacy of their contention that they did not violate the Sherman Act, and the complex theories advanced for liability, it would be likely to expect appeals from any result reached on the question of liability or of damages.  Avoidance of this expenditure of time and resources clearly benefits all parties.  See In re General Motors Pick-Up Trust Fuel Tank Products Liab. Litig., 55 F.3d 768, 812 (3d Cir. 1995) (concluding that lengthy discovery and ardent opposition from the defendant with "a plethora of pretrial motions" were facts favoring settlement, which offers immediate benefits and avoids delay and expense); Rolland v. Cellucci, 191 F.R.D. 3, 10 (D. Mass. 2000) (prospect of two week trial "would have imposed significant preparatory time on everyone and would likely have required the court several months to issue an opinion.").

Finally, even if a trial resulted in a judgment for Plaintiffs, such judgment might not equal the amount of the Settlement, while Plaintiffs would have incurred additional expense and delay, as well as the risk of non-recovery based on a verdict for Defendants or reversal of a verdict for Plaintiffs on appeal.  Therefore, this factor weighs in favor of approving the Settlement.

b.  The Reaction of the Class to the Settlement

The response of the Class to the proposed Settlement also supports approval.  As described above in Part I, the Settlement Notice included a description of: (a) the allegations of the Class Action; (b) the Class certified by the Court; (c) Class members' rights to opt-out or object under Rule 23; (d) the proposed plan of allocation; (e) the attorneys' fees, reimbursement of expenses and incentive award that would be sought, and (f) the process for Court approval. All Class members were sent copies of the Notice.  The deadline for serving objections to the Settlement was October 26, 2005.  No Class members have objected to, or have chosen to opt out of, the Settlement.  Moreover, as noted above, the three largest Class members have closely

monitored the Class Action, with the assistance of their own outside counsel, by attending meditation sessions and court hearings.   These Class members were informed of, and agreed to, the material terms of the Settlement Agreement prior to its execution.

Such acceptance of the Settlement on the part of the Class is convincing evidence of the Settlement's fairness and adequacy.  See Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118-119 (3d Cir. 1990) ("only" 29 objections in 281 member class "strongly favors settlement"); see generally In re Prudential Ins. Co. of America Sales Practices Litigation, 148 F.3d 283, 318 (3d Cir. 1998) (affirming conclusion that class reaction was favorable where 19,000 policyholders out of 8 million opted out and 300 objected). These factors weigh in favor of the Settlement.

Furthermore, where, as here, a class is comprised of sophisticated business entities that can be expected to oppose any settlement they find unreasonable, the lack of objections indicates the appropriateness of the Settlement.  See In re M.D.C. Holdings Securities Litigation, 1990 WL 454747, *10 (S.D.Cal. Aug 30, 1990) (lack of objections "is significant since the class includes sophisticated financial institutions . . . who have counsel available to advise and represent them and submit objections to either the settlement or the fees and expenses").  The absence of objections from the sophisticated Class is particularly significant here because many Class members here have also been members of classes certified in other pharmaceutical antitrust actions (see, e.g., In re Relafen Antitrust Litigation, 2005 WL 2386119 (D.Mass. Sep. 28, 2005); In re Cardizem CD Antitrust Litig., No. 99-73259 (E.D. Mich. Nov. 25, 2002); In re Buspirone Patent and Antitrust Litigation, 210 F.R.D. 43 (S.D.N.Y. 2002)), and are therefore well suited to evaluate a proposed settlement in an action of this type.

       c.  The Stage of the Proceedings and the Amount of Discovery Completed

The purpose of this <u>Girsh</u> factor is to ensure that Class Counsel has an "adequate appreciation of the merits of the case before negotiating" a settlement.  <u>In re Prudential</u>, 148 F.3d at 319, <u>quoting</u> <u>In re General Motors</u>, 55 F.3d at 813.  In the present case, the Settlement comes only after the parties had sufficient time to understand and evaluate their respective positions.

As discussed in Part I, discovery in this case spanned more than a year, is complete, and has been extensive.  This discovery included the entire record in the underlying patent litigation, numerous interrogatories and document requests, as well as third-party subpoenas to pharmaceutical manufacturers and consultants to the pharmaceutical industry.  Direct Purchasers Plaintiffs reviewed over one million pages of documents and data produced by Defendants and third parties.  Plaintiffs also answered extensive interrogatories and produced voluminous records, and both Plaintiffs' and Defendants' experts have been extensively deposed.

Given this vast amount of discovery obtained, and the volume of motion practice that enabled Plaintiffs' Counsel to preview some of the defenses that Defendants would advance, Plaintiffs' Counsel had a valid basis to negotiate a settlement.  <u>See</u> <u>In re Lucent Technologies, Inc., Securities Litigation</u>, 307 F. Supp. 2d 633, 638 (D. N.J. 2004).  Moreover, the mediation and negotiation process was itself rigorous and involved, giving the parties ample opportunity to assess the strengths of their respective claims and defenses before both learned mediators and the Court.  <u>See</u> <u>In re Linerboard Antitrust Litig.</u>, 296 F. Supp.2d 568,  578 (E.D. Pa. 2003) (noting positively that settlement talks involved "a number of face to face meetings and telephone conferences.").

As a result of the parties' efforts, the litigation had reached the stage where "the parties certainly [had] a clear view of the strengths and weaknesses of their cases."  <u>Bonett v.</u>

Educational Debt Service, Inc., 2003 WL 21658267, *6 (E.D. Pa. May 9, 2003), quoting In re
Warner Communications Sec. Litig., 618 F. Supp. 735, 745 (S.D.N.Y. 1985).  Thus, the final
Settlement occurred only after the parties and the Court were able to assess its fairness
adequately.

d.  The Risks of Establishing Liability

This factor surveys the possible risks of litigation in order to balance the likelihood of
success and potential damages against benefit of settlement.  In re Prudential, 148 F.3d at 319.
The history and current status of the litigation indicate that Plaintiffs face significant risk even
before reaching trial.  In an opinion dated September 8, 2004, this Court dismissed Plaintiffs'
claims arising from allegations of fraud in connection with the prosecution of the '099 patent,
wrongful listing of that patent in the Orange Book, and subsequent sham litigation. Therefore,
without this Settlement, Plaintiffs would have to proceed on two claims: (1) the claim relating to
the Defendants' decision to list the '099 patent 14 months after the deadline to do so established
by FDA regulations (the "late listing claim"); and (2) Plaintiffs' claim that Defendants had
engaged in an overarching scheme to delay competition, the net effect of which was
anticompetitive, even if the individual acts of the scheme were not actionable under Section 2 of
the Sherman Act (the "overarching scheme claim").  The risk to those surviving claims was
immediate: pending before the Court at the time the Settlement was proposed was Defendants'
omnibus motion for summary judgment, wherein Defendants argued that the late listing and
overarching scheme claims were barred entirely by the Court's prior findings and Supreme Court
precedent.

Finally, if Plaintiffs had succeeded in reaching trial, Plaintiffs would have had to prove
that Defendants (1) possessed monopoly power, and (2) willfully acquired or maintained that

12

power as distinguished from the growth or development of such due to a superior product, business acumen, or historic accident.  U.S. v. Grinnell Corp., 384 U.S. 563, 571 (1966). Defendants raised numerous legal and factual defenses, including, *inter alia*, assertions that Direct Purchasers' claims: (1) involved no cognizable antitrust injury or damage; (2) were barred by the Noerr-Pennington doctrine; (3) were barred for failure to define properly an antitrust market; (4) described harm that was effectively "passed-on" to third parties; and (5) were time-barred by the applicable statute of limitations.  Moreover, the Court's February 18, 2005 opinion denying Plaintiffs' motion for partial summary judgment on the issue of monopoly power would require Plaintiffs to prepare a complex and detailed analysis of the "relevant market" in which Remeron competed, in order to demonstrate the existence of antitrust liability.  These risks of proving liability weigh in favor of approving this settlement.

### e.  The Risks of Establishing Damages

The fifth Girsh factor to be analyzed when considering the fairness of a settlement is "the risk of establishing damages." Girsh, 521 F.2d at 157.  This factor "attempts to measure the expected value of litigating the action rather than settling it at the current time."  In re Cendant, 264 F.3d at 239.  To the extent that establishing damages is contingent upon liability, many of the same risks discussed in the previous section are also present here.  Furthermore, there are substantial risks in proving damages, which the parties have avoided by virtue of the proposed settlement.

The determination of damages is a complicated and uncertain process.  In the present case, the parties offered competing expert reports which included significantly different estimates of overcharge damages to which Plaintiffs would be entitled assuming liability could be proven

at trial.  Plaintiffs' expert economist estimates that the maximum antitrust damages (prior to trebling) ranged from $108 million to $133 million, while Defendants' expert, relying on a similar damage model but disagreeing on certain material assumptions, estimated the same range as $23.9 million to $29.7 million.  It is by no means certain that Plaintiffs would have succeeded in recovering the maximum measure of damages estimated by Plaintiffs' expert.  See, e.g., In re Aetna Inc. Sec. Litig., 2001 WL 20928, *10 (E.D. Pa. Jan 4, 2001) ("Plaintiffs' damages theories rested primarily on the testimony and reports of expert witnesses.  Such experts would likely have been challenged on Daubert or other grounds.  Plaintiffs, therefore, risked the rejection of its experts first by the Court pursuant to Federal Rule of Evidence 104(a), or by the jury in assessing credibility."); In re Prudential Ins. Co. of America Sales Practices Litigation, 962 F.Supp. 450, 539 (D.N.J. 1997) ("a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials"); In re Safety Components, Inc. Securities Litigation, 166 F. Supp. 2d 72, 90 (D. N.J. 2001).  Therefore, the risks of proving damages weigh in favor of approving the settlement.

### f.  The Risks of Maintaining the Class Action Through Trial

"Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial."  End-Payor Opinion at *23, quoting In re Warfarin Sodium Antitrust Litigation, 391 F.3d 516, 537 (3d Cir. 2004) (internal quotes and citation omitted).  The Settlement here comes after Plaintiffs' motion for class certification has been fully briefed.  The briefing submitted indicates that this is a hotly contested issue, with Defendants raising multiple factual and legal arguments in opposition to certification.  Class certification was granted here only after the Settlement had been proposed,

and the Defendants had stipulated not to oppose Plaintiffs' certification request.  Thus, the risks

faced by Plaintiffs with regard to class certification weigh in favor of approving the Settlement.

g.  The Ability of the Defendants to Withstand a Greater Judgment

The parties do not contend that Defendants could not withstand a larger judgment.

However, as this Court has noted, "many settlements have been approved where a settling

defendant has had the ability to pay greater amounts."  End-Payor Opinion at *23, citing

Warfarin Sodium, 391 F.3d at 538 ("[T]he fact that DuPont could afford to pay more does not

mean that it is obligated to pay any more than what the ... class members are entitled to under the

theories of liability that existed at the time the settlement was reached."); Young Soon Oh v. AT

& T Corp., 225 F.R.D. 142, 150-51 (D.N.J. 2004); In re Linerboard Antitrust Litig., 321 F. Supp.

2d 619, 632 (E.D.Pa. 2004); Erie County Retirees Assoc. v. County of Erie, Pennsylvania, 192 F.

Supp. 2d 369, 376 (W.D. Pa. 2002); Lazy Oil Co. v. Witco Corp., 95 F. Supp.2d 290, 318 (W.D.

Pa. 1997). This factor does not favor nor disfavor the Settlement.

h.  The Range of Reasonableness of the Settlement In Light of the Best
    Possible Recovery

An  assessment of the reasonableness of a proposed settlement seeking monetary relief

requires analysis of the present value of the damages a plaintiff would likely recover if

successful, appropriately discounted for the risk of not prevailing.  See In re Prudential, 148 F.3d

at 322.  As this Court previously noted, "[i]n order to evaluate the propriety of an antitrust class

action settlement's monetary component, a court should compare the settlement recovery to the

estimated single damages. Although in certain circumstances a plaintiff class may recover treble

damages if it prevails at trial, that result is far from certain." End-Payor Opinion at *24, citing In

re Ampicillin Antitrust Litig., 82 F.R.D. 652, 654 (D.D.C.1979); Detroit v. Grinnell Corp., 495

F.2d 448 (2d Cir. 1974).

In the present case, Plaintiffs' expert economist estimates that the maximum antitrust

single damages ranged from $108 million for the "late listing" claim, to $133 million for the

"overarching scheme" claim.  Accordingly, the Settlement represents 56% to 69% of the

maximum single damages Plaintiffs could hope to recover, provided that liability was proven at

trial.  This is above the range of settlements routinely granted final approval.  See End-Payor

Opinion at *24 ("[A]n antitrust class action settlement may be approved even if the settlement

amounts to a small percentage of the single damages sought, if the settlement is reasonable

relative to other factors"); see also In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001)

(approving settlement of 36% of total damages and noting that typical recoveries in complex

securities class actions range from 1.6%--14% of estimated damages); In re Linerboard Antitrust

Litig., 2004 WL 1221350,*5 (E.D. Pa. June 2, 2004) (collecting cases in which courts have

approved settlements of 5.35% to 28% of estimated (single) damages in complex antitrust

actions); In re Aetna, 2001 WL 20928, *4 (approving settlement of approximately 10% of total

damages of $830 million); Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., 2005

WL 1213926 (E.D. Pa. May 19, 2005) (Recovery of 11.4% of estimated single damages

"compares favorably with the settlements reached in other complex class action lawsuits.")

Moreover, in light of the highly contested nature of liability, it is likely that any judgment

entered would have been the subject of post-trial motions and appeals, further prolonging the

litigation and reducing the value of any recovery.  See, e.g., Parks v. Portnoff Law Associates,

Ltd., 243 F.Supp.2d 244, 253 (E.D. Pa. 2003).  An appeal of a damage award could seriously and

adversely affect the scope of an ultimate recovery, if not the recovery itself.  See Backman v.

Polaroid Corp., 910 F.2d 10 (1st Cir. 1990) (class won a jury verdict and a motion for judgment N.O.V. was denied, but on appeal the judgment was reversed and the case dismissed); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979) (reversal of multimillion dollar judgment obtained after protracted trial); Trans World Airlines, Inc. v. Hughes, 312 F. Supp. 478, 485 (S.D.N.Y. 1970), modified, 449 F.2d 51 (2d Cir. 1971), rev'd 409 U.S. 363, 366 (1973) ($145 million judgment overturned after years of litigation and appeals).  Thus, the range of reasonableness of the settlement in light of the best possible recovery favors the Settlement.

       i.  The Range of Reasonableness of the Settlement to a Possible Recovery
          In Light of all the Attendant Risks of Litigation

This factor requires the Court to examine the terms of settlement from a "slightly different vantage point[]" than reasonableness in light of the best recovery. In re General Motors, 55 F.3d at 806.  As this Court noted, "a court evaluating a proposed class action settlement should also consider 'whether the settlement represents a good value for a weak case or a poor value for a strong case.'" End-Payor Opinion at *23, quoting  Warfarin Sodium, 391 F.3d at 538; see also Girsh, 521 F.2d at 157 (court must examine the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation).

As discussed above, this litigation involves difficult legal and factual issues regarding a claim for damages resulting from Defendants' alleged violation of Section 2 of the Sherman Act. Thus, in light of the significant size of the settlement fund relative to the potential recoverable damages, the Settlement represents a good value for a strong case, albeit one where numerous critical legal issues have not been determined and are therefore uncertain.  In addition, even if Plaintiffs successfully prevailed on those issues at trial, Defendants would likely appeal, resulting in further delaying any recovery for the Class.  The Court is satisfied that the Settlement accounts

for the risks inherent in this complex litigation and provides appropriate relief in light of these risks.

j.  Conclusion

Given this Court's analysis, the Court concludes that the nine-factor test utilized by the Third Circuit is satisfied.  The settlement is fair, adequate, and reasonable under Federal Rule of Civil Procedure 23(e).

**B.      Approval of the Plan of Allocation**

"As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate."  In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 381 (D.D.C. 2002); see also In re Vitamins Antitrust Litig., 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000).  "[I]n evaluating the formula for apportioning the settlement fund, the Court keeps in mind that district courts enjoy broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably."  Hammon v. Barry, 752 F. Supp. 1087, 1095 (D.D.C. 1990) (internal quotation marks and citations omitted); accord In re "Agent Orange" Prod. Liability Litig., 818 F.2d 179, 181 (2d Cir. 1987).

Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses ("Net Settlement Fund"), in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade.  Such a method of allocating the Net Settlement Fund is inherently reasonable.  See In re Lucent Technologies, Inc., Securities Litigation, 307 F. Supp. 2d 633, 649 (D. N.J. 2004) ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."); In re Corel Corp. Inc. Securities Litigation, 293 F. Supp. 2d 484, 493 (E.D. Pa. 2003) (Courts "generally consider plans of allocation that reimburse class members

based on the type and extent of their injuries to be reasonable.") quoting Aetna Inc. Sec. Litig., 2001 WL 20928, * 12 (E.D. Pa. Jan.4, 2001).

The Plan of Allocation provides a method for determining each Class member's pro-rata share of the Net Settlement Fund.   Specifically, the Plan of Allocation describes: 1) the method of calculating each Class member's overcharge damages and pro-rata share of the Net Settlement Fund; 2) the contents and method of disseminating a Claims Notice form; 3) the manner in which claims will be initially reviewed and  processed; 4 ) the method of notifying Class members of the amount that each Class member will receive from the Net Settlement Fund ("Notice of Class Member Distribution Amount"); and 5) the process for handling and resolving challenged claims.

The Plan of Allocation also includes the deadlines for completing the following tasks related to distributing each Class member's pro-rata share of the Net Settlement Fund: 1) preparation and dissemination of the Claims Notice form; 2) receipt by Claims Administrator of completed Claims Notice form and supporting documentation; 3) curing deficiencies in any Claims Notice form or supporting documentation submitted by Class member; 4) disseminating the Notice of Class  Member Distribution Amount; and, 5) challenging and resolving disputes over the Claims Administrator's determination of each Class member's distribution amount.

As the Plan of Allocation appears fair based on Plaintiffs' expert economist's calculations, and the three largest Class members support it, and the lack of any objections to it, this Court gives the plan final approval.

C.  **Plaintiffs' Motion for Award of Attorneys' Fees, Interest, Reimbursement of Expenses and Incentive Awards**

Class Counsel requests that the Court award attorneys' fees in the amount of $25 million plus interest accrued on that amount since it has been held in escrow.  The $25 million requested fee represents 33 1/3 % of the $75 million Settlement Fund.  Class Counsel also requests recovery of litigation expenses and incentive awards to named Plaintiffs.

1.  Attorneys' Fees and Interest

_____This Court first finds that the percentage of fund method is the proper method for compensating Plaintiffs' Counsel in this common fund case.  See, e.g., In re Prudential Ins. Co. Of America Sales Practices Litig., 148 F.3d 283, 333 (3d Cir. 1998) (stating "the percentage of recovery method is generally favored in cases involving a common fund, and is designed to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure"); In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 734 (3d Cir. 2001) (stating "the percentage-of-recovery method has long been used in this Circuit in common-fund cases").

The Third Circuit set forth with specificity the factors that a court should consider in evaluating such requested attorneys' fees in Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000) (overturning a decision that reduced a requested fee of 25% of the recovered fund to 18%).  The Gunter factors "need not be applied in a formulaic way, and their weight may vary on a case-by-case basis."  Oh v. AT & T Corp., 225 F.R.D. 142, 146 (D.N.J. 2004) (citing Gunter, 223 F.3d at 195).  The Gunter factors include (a) the size of the fund created and number of persons benefitting from the settlement, (b) the presence/absence of substantial objections to the fee, (c) the skill of Plaintiffs' counsel, (d) complexity and duration of the litigation, (e) the

20

risk of nonpayment, (f) amount of time devoted to the litigation, (g) awards in similar cases.  See
Gunter, 223 F.3d at 195; In re Aremissoft Corp. Sec. Litig., 210 F.R.D. 109, 129 (D.N.J. 2002).

> a.  The Size and Nature of the Common Fund Created, and the Number of
> Class Members Benefitted by the Settlement

The Class here is comprised of approximately 70 business entities, as identified from
Defendants' sales records.  These entities will share in a settlement worth $75 million in cash,
less attorneys' fees, expenses and incentive award as granted by the Court.  The magnitude of
this recovery is significant when measured against the estimates as to the potential values of
Plaintiffs' claims made by the parties' experts during the course of this litigation.  See, e.g., In re
General Instrument Securities Litig., 209 F. Supp.2d 423 (E.D. Pa. 2001) (awarding a one-third
fee, and finding that a $48 million fund to be shared by a class of thousands is "quite large" and
exceeds "twice the amount that defendants' expert claimed plaintiffs could recover under the best
circumstances."); In re Linerboard Antitrust Litig., 2004 WL 1221350 (E.D. Pa. June 2, 2004)
($202 million settlement valued at 42 percent of damages (prior to trebling) is "highly favorable"
factor in granting counsel's 30% fee request).

> b.  The Absence of Objections

Following preliminary approval of the Settlement and the form and manner of notice to
the Class, individual notice was mailed to Class members and posted on Co-Lead Counsel's
websites.  The notice informed potential Class members that Class Counsel would be seeking
fees of up to 33 1/3% of the Settlement Fund, reimbursement of expenses, plus interest thereon,
and incentive awards for each of the named plaintiffs in the Class Action.

Class Counsel have received no objections from the Class.[1]   The lack of objections from the Class supports the reasonableness of the fee request.  See Stoetzner v. United States Steel Corp., 897 F.2d 115, 11-19 (3d Cir. 1990) (even when 29 members of a 281 person class (i.e. 10% of the class) objected, the response of the class as a whole "strongly favors [the] settlement"); In re Rite Aid, 396 F.3d at 305 (stating that the fact that only two class members objected to the fee request supports approval of the fee); In re Rent-Way Sec. Litig., 305 F. Supp.2d 491, 514 (W.D. Pa. 2003) ("[t]he absence of substantial objections by other class members to the fee application supports the reasonableness of Lead Counsel's request"). thus indicating the strong support of the Class for the award of fees and expenses requested.

c.  The Skill and Efficiency of Plaintiffs' Counsel

Class Counsel include some of the preeminent antitrust firms in the country with decades of experience in prosecuting and trying complex actions.  Class Counsel also include firms with extensive patent experience, who are intimately involved in numerous lawsuits involving antitrust violations based on the improper use of patents.  Class Counsel have significant

_____

[1] The support of the fee request by Class members here is even more significant.  When a class is comprised of sophisticated business entities that can be expected to oppose any request for attorney fees they find unreasonable, the lack of objections "indicates the appropriateness of the [fee] request."  Cimarron Pipeline Construction, Inc. v. Nat'l Council on Compensation Ins., 1993 WL 355466, *1-2 (W.D. Ok. June 8, 1993); In re Sequoia Systems, Inc. Sec. Litig., 1993 WL 616694,  *1 (D. Mass. Sept. 10, 1993) (finding "influential" the fact that no class member had objected to the fee request of one-third); In re M.D.C. Holdings, 1990 WL 45474 at *10 n. 5 (lack of objections "is significant since the class includes sophisticated financial institutions . . . who have counsel available to advise and represent them and submit objections to either the settlement or the fees and expenses").  Courts have reasoned that favorable responses by sophisticated Class members is persuasive, since those class members are capable, independent of the assistance of Class Counsel, of evaluating the reasonableness of all aspects of a class action settlement.  See, e.g., Muehler v. Land O'Lakes, Inc., 617 F. Supp. 1370, 1374 (D. Minn. 1985) ("The turkey growers in this class are sophisticated businesspeople, who possessed the degree of knowledge and ability sufficient to raise an objection if they believed the fee application was excessive").

experience in FDA regulatory matters.  The settlement entered with Defendants is a reflection of

Class Counsel's skill and experience.  See In re Warfarin Sodium Antitrust Litig., 212 F.R.D.

231, 261 (D. Del. 2002) (class counsel "showed their effectiveness through the favorable cash

settlement they were able to obtain"); see also In re Ikon Office Solutions, Inc. Sec. Litig., 194

F.R.D. 166, 194 (E.D. Pa. 2000) (awarding 30% fee and stating "the most significant factor in

this case is the quality of representation, as measured by the quality of the result achieved, the

difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise

of the counsel, the skill and professionalism with which counsel prosecuted the case and the

performance and quality of opposing counsel") (internal quotes omitted).

d.  The Complexity and Duration of the Litigation

"As to the complexity of the case, '[a]n antitrust class action is arguably the most

complex action to prosecute.'"  In re Linerboard Antitrust Litig., 2004 WL 1221350 at *10,

quoting In re Motorsports Merchandise Antitrust Litig., 112 F. Supp. 2d 1329, 1337 (N.D. Ga.

2000).  This antitrust action is no different.  As discussed above, this matter is extremely

complicated, involving the patent, regulatory and antitrust laws, including interpretation of

complex provisions of the Hatch-Waxman Act.

The discovery process was lengthy and difficult.  Class Counsel (a) reviewed over one

million pages of documents, (b) conducted over 45 depositions of fact witnesses, and (c) spent

thousands of hours researching, analyzing and consulting with experts on the complex issues of

fact and law put at issue in this case.

Finally, as noted by this Court in the End-Payor Opinion, "the circumstances surrounding

a difficult settlement increase the complexity of a case."  See End-Payor Opinion at *29, citing In

re Lucent Technologies, Inc. Sec. Litig., 327 F. Supp. 426, 434 (D. N.J. 2004).  Here, the Court is

23

well aware of the long and difficult road that led to the proposed Settlement, as the Court itself frequently lent its good offices to settlement hearings and mediation sessions.  Thus, the complexity of the issues involved in Class Counsel's prosecution of this litigation supports the requested fee.

        e.  The Risk of Nonpayment

A determination of a fair fee must include consideration of the sometimes undesirable characteristics of a contingent antitrust actions, including the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high.  See, e.g., The Stop & Shop Supermarket Company v. SmithKline Beecham Corp., 2005 WL 1213926, *11 (E.D. Pa. 2005) (risk of overcoming Noerr-Pennington defense, among others, "favors approval of the percentage of recovery requested as a fee in this case"); In re Linerboard Antitrust Litig., 2004 WL 1221350 at * 12 (risk posed by Defendants' vigorous legal and factual defenses counsel in favor of 30% fee award).

This case is no exception to the rule.  When Class Counsel undertook the representation of the named plaintiffs and the Class, there were no assurances that any fees would be received. The outcome of various motion practice in this case further increased Plaintiffs' risks.  In its September 8, 2004 decision on Defendants' motion to dismiss, the Court dismissed (a) Plaintiffs' claims arising from the alleged Walker-Process fraud, (b) wrongful Orange Book listing and (c) sham litigation associated with the prosecution and enforcement of the '099 Patent.  Following this opinion, every plaintiff group other than the Direct Purchaser Class, including the Generics and all other direct and indirect purchasers, chose to settle their claims.

Thereafter, Plaintiffs proceeded against Defendants on two theories of liability: (1) claims arising from the late-listing of the '099 patent in the Orange Book; and (2) Defendants' alleged overarching scheme to delay generic competition.  The risk to those surviving claims was immediate: pending before the Court at the time the Settlement was proposed was Defendants' omnibus motion for summary judgment, wherein Defendants argued that the late listing and overarching scheme claims were barred entirely by the Court's prior findings and Supreme Court precedent, and refuted by documentary evidence and testimony from Defendants' own employees. The prospect of prosecuting such untested theories through to trial presented undeniable risk.  Accordingly, the risk of non-payment in this case weigh heavily in favor of approving the fee requested.

f.  The Time Devoted to this Case by Plaintiffs' Counsel was Significant

Class Counsel has expended over 35,000 hours and advanced over $1.9 million in expenses on this case.  Class Counsel has analyzed over a million pages of document discovery and has taken dozens of depositions.  Class Counsel also retained and worked closely with multiple experts in the complex areas of patent law, FDA regulation and the pharmaceutical industry implicated in this case.  Class Counsel fought Defendants' motion to dismiss, prepared Plaintiffs' motion for class certification, and represented the Class in the multiple mediation sessions and settlement conferences necessary to reach the Settlement.  See End Payor Opinion at *29 ("Class Counsel's 'efforts in posturing this case for trial . . . played a role in spurring the settlement [and] produced a substantial payout to the class.'") quoting In re Newbridge Networks Securities Litigation, 1998 WL 765724, *3 (D. D.C. Oct 23, 1998).

Moreover, Class Counsel will likely incur hundreds of additional hours in connection with administering the settlement, without prospect for further fees. See Varacallo, 226 F.R.D. at

252 (fee award will be sole compensation for counsel "despite the continuing responsibilities

[counsel] will have in responding to Class Member inquiries, assisting the Claim Evaluator,

consulting on individual cases, and any post-judgment proceedings and appeals.").

      g.  Awards in Similar Cases

The seventh and final <u>Gunter</u> factor – a comparison with attorneys' fees awarded in

similar cases – also supports the fee requested by Class Counsel in the present case.

      i.  The requested 33 1/3% fee is within the applicable
      range of percentage-of-the-fund awards

"Courts within the Third Circuit often award fees of 25% to 33% of the recovery." End-

Payor Opinion at *30, <u>citing</u> <u>In re Linerboard Antitrust Litig.</u>, 2004 WL 1221350 (E.D. Pa. June

2, 2004) (approving 30% fee of a $202 million settlement in an antitrust class action); <u>Nichols v.</u>

<u>SmithKline Beecham Corp.</u>, 2005 WL 950616 (E.D. Pa. 2005) (approving 30% fee of the $65

million settlement in similar pharmaceutical antitrust action).  A one third fee from a common

fund has been found to be typical by several courts within this Circuit which have undertaken

surveys of awards within the Third Circuit and others.  End-Payor Opinion at *30, <u>citing</u> <u>In re</u>

<u>Rite Aid Corp. Sec. Litig.</u>, 396 F.3d 294, 306-07 (3d Cir. 2005) (review of 289 settlements

demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns

out to be one-third").  <u>See also</u> <u>In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab.</u>

<u>Litig.</u>, 55 F.3d 768, 822 (3d Cir. 1995) (In common fund cases "fee awards have ranged from

nineteen percent to forty-five percent of the settlement fund");  <u>Cullen v. Whitman Medical</u>

<u>Corp.</u>, 197 F.R.D. 136, 150 (E.D. Pa. 2000) ("the award of one-third of the fund for attorneys'

fees is consistent with fee awards in a number of recent decisions within this district"); <u>In re</u>

<u>Linerboard Antitrust Litig.</u>, 2004 WL 1221350  at *14 (citing with approval  "a recent Federal

Judicial Center study that found that in federal class actions generally median attorney fee awards were in the range of 27 to 30 percent.").

Moreover, the requested fee is consistent with awards in other complex antitrust actions involving the pharmaceutical industry.  See In re Relafen Antitrust Litig., No. 01-12239-WGY (D. Mass. April 9, 2004) (awarding 33⅓% fee of a $175 million settlement); In re Buspirone Antitrust Litig., No. 01-CV-7951 (JGK) (S.D.N.Y. April 1, 2003) (awarding a 33⅓% fee of a $220 million settlement); North Shore Hematology-Oncology Associates, P.C. v. Bristol Myers Squibb Co., No. 1:04cv248 (EGS) (D. D.C. Nov. 30, 2004) (awarding a 33⅓% fee of a $50 million settlement);  In re Terazosin Hydrocholride Antitrust Litig., No. 99-MDL-1317 (S.D. Fla. Apr. 19, 2005);  (awarding a 33⅓% fee of a $72.5 million settlement).  Cf. In re Cardizem CD Antitrust Litig., No. 99-73259 (E.D. Mich. Nov. 26, 2002) (awarding 30% of a $110 million settlement).

              ii.  The requested 33 1/3%  fee reflects the market
                rate in other litigation of this type

The percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee which would be negotiated if the lawyer were offering his or her services in the private marketplace.  "The object ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation."  In re Continental Illinois Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992); see also Missouri v. Jenkins, 491 U.S. 274, 285-86 (1989); In re Synthroid Marketing Litig., 264 F.3d 712, 718 (7th Cir. 2001) ("when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at

the time"); see also Thirteen Appeals, 56 F.3d at 307; In re RJR Nabisco, Inc. Sec. Litig., 1992 WL 210138, *7 (S.D.N.Y. Aug. 24, 1992).

In determining the market price for such services, evidence of negotiated fee arrangements in comparable litigation should be examined.  See Continental Illinois Sec. Litig., 962 F.2d at 573 (the judge must try to simulate the market "by obtaining evidence about the terms of retention in similar suits, suits that differ only because, since they are not class actions, the market fixes the terms"); Synthroid Marketing Litig., 264 F.3d at 719 (court should evaluate fee contracts and other data from similar cases where fees were privately negotiated).  Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation.  See, e.g., In re Ikon Office Solutions, Inc., 194 F.R.D. at 194 ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.");  In re Orthopedic Bone Screws Products Liability Litig., 2000 WL 1622741, *7 (E.D. Pa. Oct. 23, 2000) (". . . the court notes that plaintiffs' counsel in private contingency fee cases regularly negotiate agreements providing for thirty to forty percent of any recovery"); Durant v. Traditional Investments, Ltd., 1992 WL 203870, *4 n. 7 (S.D.N.Y. Aug. 12, 1992) ("contingent fee agreements up to 40 percent have been held reasonable"); Phemister v. Harcourt Brace Jovanovich, Inc., 1984 WL 21981, *15 (N.D. Ill. Sept. 14, 1984) ("[t]he percentages agreed on [in contingent fee arrangements in non-class action damage lawsuits] vary, with one-third being particularly common").

h.  Lodestar Cross-Check

In addition to the percentage-of-the-fund approach, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method. Prudential, 148 F.3d at 333.  A lodestar cross-check is not a Gunter factor but is a "suggested practice." In re Cendant Corp., PRIDES Litig., 243 F.3d at 735 (3d Cir. 2001).  The Third Circuit has recognized that "'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" Id., at 341, quoting 3 Herbert Newberg & Albert Conte, Newberg on Class Actions, § 14.03 at 14-5 (3d ed. 1992). "The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." In re Rite Aid, 396 F.3d at 306-07 (footnote omitted).

The records demonstrates that Class Counsel's lodestar in this case is $13,419,645.71, resulting in a multiplier of 1.8.  An examination of recently approved multipliers reveals that the multiplier requested here "is on the low end of the spectrum."  End-Payor Opinion at * 33, (approving multiplier of 1.73) citing Nichols v. SmithKline Beecham Corp., 2005 WL 950616, *24 (E.D. Pa. Apr. 22, 2005) (approving multiplier of 3.15); In re Linerboard Antitrust Litig., 2004 WL 1221350, *4 (E.D. Pa. June 2, 2004) (approving a 2.66 multiplier); Weiss v. Mercedes-Benz of N. Am., Inc., 899 F. Supp. 1297, 1304 (D. N.J. 1995), aff'd, 66 F.3d 314 (3d Cir. 1995) (approving a 9.3 multiplier); In re Rite Aid Corp. Secs. Litig., 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001)  (multiple of over 6).  This lodestar cross-check corroborates the result of the percentage-of-the-fund method.

i.  Conclusion

Taking into consideration the above factors, this Court awards Plaintiffs' Counsel $25 million of the Settlement Fund, plus 33 1/3 % of the accrued interest on the Settlement Fund.

2.   Reimbursement of Reasonable Expenses

In addition to their request for attorneys' fees, Plaintiffs' Counsel seeks reimbursement of $1,925,667.53 in expenses.  "Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case."  In re Cendant Corp., 232 F. Supp. 2d 327, 343 (D. N.J. 2002), quoting In re Safety Components Int'l, Inc., 166 F. Supp. 2d 72, 104 (D. N.J. 2001).

Upon review of the affidavits submitted in support of this request, the Court finds the requested amount to be fair and reasonable.  Plaintiffs' Counsel's expenses reflect costs expended for purposes of prosecuting this litigation, including substantial fees for experts; substantial costs associated with creating and maintaining an electronic document database; travel and lodging expenses; copying costs; and the costs of court reporters and deposition transcripts.  Reimbursement of similar expenses is routinely permitted.  See End-Payor Opinion at *32, citing Oh v. AT & T Corp., 225 F.R.D. 142, 154 (D. N.J. 2004) (finding the following expenses to be reasonable: "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund-pro hac vice.").

3.   Incentive Awards to Named Plaintiffs

Finally, Plaintiffs' Counsel request the approval of an incentive award in the amount of $60,000, in total, for the two named plaintiffs, LWD and Meijer.  The named plaintiffs spent a significant amount of their own time and expense litigating this action for the benefit of the Class.  As recognized by numerous courts, such efforts should not go unrecognized.  See End-Payor Opinion at *32, citing In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369,

30

400 (D. D.C. 2002) ("Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class . . . . In fact, [c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation") (internal quotations and citation omitted).

The Settlement Notice advised Class members that Class Counsel would apply for such an incentive award.  No Class member objected.  Moreover, the amount requested here is similar to amounts awarded in comparable settlements.  <u>See</u>  End-Payor Opinion at *33 (granting incentive awards of $30,000 each to two third party payor plaintiffs); <u>In re Linerboard Antitrust Litig.</u>, 2004 WL 1221350  at *18 (approving $25,000 to each representative of the classes); <u>see also</u>, <u>Yap v. Sumitomo Corp. of America</u>, 1991 WL 29112, *9 (S.D.N.Y. Feb. 22, 1991) ($30,000 incentive awards to the named plaintiffs); <u>Van Vranken v. Atlantic Richfield Co.</u>, 901 F. Supp. 294, 300 (N.D. Cal. 1995) ($50,000 incentive award to named plaintiff); <u>In re Dun & Bradstreet Credit Services Customer Litig.</u>, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (two incentive awards of $55,000 and three incentive awards of $35,000); <u>In re Revco Sec. Litig.</u>, 1992 WL 118800, *7 (N.D. Ohio May 6, 1992) ($200,000 incentive award to named plaintiff); <u>Enterprise Energy Corp. v. Columbia Gas Transmission Corp.</u>, 137 F.R.D. 240, 250-51 (S.D. Ohio 1991) ($50,000 incentive awards to each of the six named plaintiffs); <u>Bogosian v. Gulf Oil Corp.</u>, 621 F. Supp. 27, 32  (E.D. Pa. 1985) (incentive awards of $20,000 to each of two named plaintiffs).  The requested incentive awards are both appropriate and reasonable.

## III.    CONCLUSION

For the foregoing reasons, (a) Direct Purchasers Plaintiffs' motion for final approval of the Settlement, and (b) Class Counsel for Direct Purchasers Plaintiffs' motion for attorneys' fees of $25 million (plus accrued interest), litigation expenses, and incentive awards to Named Plaintiffs are granted.

/s/ Faith S. Hochberg

**Hon. Faith S. Hochberg, U.S.D.J.**
